IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2014

**STATE OF TENNESSEE v. WAYNE SELLERS**

**Appeal from the Criminal Court for Shelby County**
**No. 13-00442     J. Robert Carter, Jr., Judge**

_____

**No. W2013-02771-CCA-R3-CD  - Filed November 20, 2014**

_____

Defendant, Wayne Sellers, was indicted by the Shelby County Grand Jury for one count of aggravated rape.  After a jury trial, Defendant was convicted as charged in the indictment.  As a result, he was sentenced to twenty-three years as a Range I, standard offender and ordered to serve 100% of the sentence as an aggravated rapist.  On appeal, Defendant challenges the sufficiency of the evidence and the admission of photographs of the victim's genitalia at trial.  After a thorough review of the record, we determine that the evidence was sufficient to support the conviction and that the trial court did not err in admitting the photographs.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Tony N. Brayton, Assistant Public Defender (on appeal); Robert Felkner, Assistant Public Defender (at trial), Memphis, Tennessee, for the appellant, Wayne Sellers.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Amy P. Weirich, District Attorney General; Cavett Ostner and Carrie Shelton-Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

Defendant was indicted for the aggravated rape of S.M.,[1] a 64-year-old woman. The victim was living in Memphis in December of 2011. The morning of the incident, S.M. set out on foot from her apartment in East Camilla Towers[2] with her "red cart" and her "bags" to pay her bill at a storage facility. She was notified that her account was in arrears and she needed to pay $267 or the facility would sell her belongings. S.M. used the red cart like a walker to help her mobility. She intended to purchase a money order at the Kroger on Frayser Boulevard before returning to the storage facility. On the way to the bus stop, she got a chicken sandwich, a diet soda, and two orders of french fries at Checkers. S.M. then tried to figure out how to "catch a trolley or how to catch the bus." She saw a police officer directing traffic for a "relay race" and asked how to get to the Kroger. She ended up going the "wrong way."

As she walked, she met a man who introduced himself as "Tyrone Jenkins." He started to follow her and asked her where she was going. He offered to "show" her how to get to the bus. S.M. explained, "[l]ike a stupid fool I followed him like a dummy because I didn't want to go. I was scared and I was frightened so I pushed myself to go so I could get that money order sent out before it got too late." S.M. followed "Tyrone" under a bridge and into a field. At that point, she was "scared" and wanted to "take off" but her foot and left hip "froze."

At that point, "Tyrone" took her cart and "threw it against the weeds." S.M. explained that he "drug [her] clothes off . . . and then put his arm around [her] neck . . . and then he threw [her] down on the ground" on her back. "Tyrone" pulled her clothes and shoes off and got on top of her. S.M. tried to push him away but was unsuccessful. "Tyrone" told her to "relax" and not to say anything while he forced his penis into her vagina. This lasted "for a long time" before "Tyrone" climaxed. S.M. stated that it "hurt." When the incident was over, "Tyrone" left and S.M. screamed. "Tyrone" then came back, and helped S.M. put her shoes back on her feet before running away. As he ran away, he told S.M. where to catch the bus. S.M. managed to walk to a nearby tobacco plant and asked someone to call an ambulance.

Officer Wayne Ackerman of the Memphis Police Department arrived on the scene to find the S.M., whom he described as a "very emotional" woman "in her seventies or eighties maybe, . . . short, soiled clothing, didn't smell very nice, dirty." S.M. reported that she was

---

[1] It is the policy of this Court to refer to victims of sexual crimes by their initials.

[2] East Camilla Towers is a residential facility operated by the housing authority for senior citizens.

forced to walk into the woods before she was raped. Officer Ackerman accompanied S.M. to the hospital while he sent another officer out to locate the scene of the rape.

While at the hospital, Officer Ackerman sat with S.M. for "probably two, three hours." During that time, no doctors examined S.M.. Lieutenant Stephen Oliver came to the hospital to assist in the investigation; Officer Ackerman talked with him briefly. Shortly thereafter, a nurse gave Officer Ackerman the victim's chart and told him that S.M. was ready to be discharged. The officers planned to take S.M. from the hospital to the Rape Crisis Center for a rape kit exam. S.M. asked if she could use the restroom. When she stood up, Officer Ackerman noticed a "large puddle of blood that had pooled while she was laying down." The "bed was full of blood," and Officer Ackerman and Lieutenant Oliver "helped [S.M.] have a seat back on the bed and called for nurses and doctors." S.M. was finally examined and received "minor surgery" to place eight stitches in her vaginal area.[3]

While at the hospital, S.M. spoke with Lieutenant Stephen Oliver. She was able to give a physical description and first name of her attacker, "Tyrone."

Once S.M. was released from the hospital, the officers transported her to the Rape Crisis Center of Memphis. Tammy Keough from the Rape Crisis Center of Memphis testified for the State as an expert in sexual assault nurse examination. She examined S.M. on December 3, 2011. S.M. complained of pain around her neck as a result of the incident. As part of the examination Ms. Keough took photographs of S.M.'s neck with a forensic light to check for bruising under the skin. S.M. had bruises consistent with someone applying pressure to her neck and collarbone area. The bruises were not visible to the naked eye but could be seen with the forensic light and were visible in the photographs taken with a special filter. The victim also had scratches on the back of her arms and legs but reported that she did not receive them from the incident and refused to allow Ms. Keough to photograph these injuries. The victim denied having consensual sex in the previous four days. The victim was not able to "tolerate" an examination of the vagina with a speculum. Ms. Keough described the visual examination of the victim's vagina as follows:

> [T]here was dried blood over the entire area and then these were basically stitches, sutures or stitches, that I was able to see. . . . [L]eading from the outside of her vagina towards the anus was where the stitches were between her vagina and the anus. . . .

The first stitch was at the beginning of the fossa navicularis, a boat-shaped depression between the vagina/hymen and the frenulum, and extended through the posterior fourchette,

---

[3]It is unclear from the transcript as to why no doctors had examined the victim up to this point.

the muscular area between the vagina and the anal area. Ms. Keough was not able to ascertain how many, if any, stitches were on the inside of the vagina because "there was a lot of blood and [the examination] was very painful [to the victim]." Ms. Keough took photographs of the victim's vagina as part of the examination. Two photographs were admitted into evidence. One photograph depicted the victim's vagina prior to examination. The second photograph depicted the victim's vagina with the labia opened. Ms. Keough opined that the victim's injuries were "consistent with a blunt penetrating injury." During the examination, Ms. Keough collected DNA samples from the victim's cheek, her vulva, and her vagina.

As a result of the information that S.M. supplied to officers on the day of the incident, Wayne Tyrone Sellers, Defendant, was identified as a suspect. Lieutenant Oliver attempted to locate S.M. in order to present her with a photographic lineup of potential suspects. He eventually located her at the hospital, where she had been readmitted for five days as a result of losing two pints of blood from her injuries.

When shown the photographic lineup two days after the incident, S.M. was unable to identify Defendant. She explained that her "memory . . . went kind of fast and [she] couldn't remember too well." She admitted that she saw Defendant "face to face" but "just blocked [it] out of my mind." Several days later she recognized Defendant when "[Defendant] came back into that building [where she lived]" and the victim saw him. She immediately called the police. S.M. admitted that Defendant was the only person in the courtroom, beside the attorneys and the police officers, when she identified him at trial.

Defendant was brought in for questioning. He was "cooperative" and agreed to provide a DNA sample. He denied all of the allegations.

Tennessee Bureau of Investigation Special Agent Lawrence James testified as an expert in the area of DNA analysis and serology. Having tested the samples from the victim and Defendant, Special Agent James opined that "the profile indicated there was more than one person's DNA present in that profile and the profile that I got was consistent with the mixture from [the victim] and [Defendant]." Special Agent James explained that the probability that an unrelated individual would be included as a contributor to this DNA mixture was approximately one in 17.3 million based on the number of individuals from the African-American population. He explained that any time there was a "mixture" of DNA in a sample, the probability is increased but that, in his opinion, the DNA of Defendant was present in the sample.

Defendant presented no proof. After deliberating, the jury found Defendant guilty of aggravated rape as charged in the indictment. At a sentencing hearing, the trial court

sentenced Defendant to twenty-three years' incarceration at 100%. Defendant appeals, arguing that the trial court erred when it allowed the State to introduce photographs of the victim's genitalia at trial and that the evidence to support the conviction was insufficient.

*Analysis*

*Sufficiency of the Evidence*

Defendant complains on appeal that the evidence is insufficient to support the conviction for aggravated rape. Specifically, he argues that the victim's in-court identification was inadequate because Defendant was the only person, other than the attorneys and other State witnesses, in the courtroom at the time of the identification. Additionally, he argues that the testimony from the TBI scientist about DNA evidence was "less than overwhelming, at most . . . includ[ing] the defendant as a possible contributor to a mixture of DNA." The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"The identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor,* No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App.

Apr. 19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *Strickland,* 885 S.W.2d at 87 (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, "the testimony of a victim, by itself, is sufficient to support a conviction." *Id.* (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); *State v. Joshua Smith*, W2012-01059-CCA-R3-CD, 2013 WL 6095831 (Tenn. Crim. App. Nov. 19, 2013), *perm. app. denied,* (Tenn. Mar. 17, 2014).

Rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances[,]" some of which are: "[f]orce or coercion is used to accomplish the act" or "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a). "Rape" becomes "aggravated rape" if it is accompanied by any one of several different statutory factors, including when "[t]he defendant causes bodily injury to the victim." *Id.* § 39-13-502(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). "Bodily injury" is defined as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]"*Id.*. § 39-11-106(a)(2). In sum, given the context of this case, in order to support all the essential elements of aggravated rape, there must have been evidence sufficient for a reasonable jury to find beyond a reasonable doubt that: (1) sexual penetration occurred between Defendant and the victim; (2) either force was used to accomplish the penetration or the victim did not consent to the penetration and the defendant knew or should have know that the victim did not consent; and (3) the defendant cut, bruised, caused physical pain or otherwise injured the victim.

In the light most favorable to the State, there is no question that the evidence shows that the victim suffered injuries as a result of forced sexual penetration. The victim received eight stitches in her genital area and was hospitalized for five days. In fact, Ms. Keough

testified that the victim's injuries were the worst she had seen in the 240 rape examinations she had performed in her career at the Rape Crisis Center.

Further, the record demonstrates that the identity of Defendant as the perpetrator was sufficiently proven. The victim described the perpetrator to police and gave a description adequate enough for Defendant to be identified as a suspect. While the victim did not identify Defendant from a photographic lineup, we note that she was presented with the lineup while at the hospital recovering from her injuries. The victim admitted that her mind went "blank" but explained that she immediately recognized Defendant several days later when he showed up at her apartment building. Defendant complains that the victim's memory was "a little off" and her in court identification was not sufficient because Defendant was the only other person in the courtroom except the lawyers and police personnel. This argument is merely a challenge to the weight of the evidence and the credibility of the witnesses. The jury, by its verdict, found the victim's identification to be credible. We may not disturb this finding on appeal. *Pruett*, 788 S.W.2d at 561. Additionally, the trial court properly instructed the jury on the issue of identity. A jury is presumed to follow a trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008) (citing *State v. Young*, 196 S.W.3d 85, at 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn.2001)).

Moreover, the DNA evidence showed that the sample contained a mixture of genetic material from the victim and another individual, whose DNA profile was consistent with that of the Defendant. Special Agent James testified as to his training, education, and experience and opined that the probability of selecting someone at random with the same DNA profile as that in the sample was approximately one in 17.3 million among the African-American population. While Defendant insists that this testimony is "less than overwhelming, " we again note that the jury obviously accredited his testimony at trial. As explained above, we are not tasked with assessing the credibility of the witnesses. *Pruett*, 788 S.W.2d at 561. This, in our view, coupled with the victim's identification, is more than sufficient to support the conviction.

*Introduction of Photographs of Victim's Injuries at Trial*

Defendant argues that the trial court erred in admitting photographs of the victim's injuries at trial. Defendant argues that because he did not challenge the fact that the victim sustained injuries and there was additional testimony about the extent of the injuries, the photographs were purely prejudicial and only served to inflame the jury. The State insists, on the other hand, that the photographs were necessary to prove the element of bodily injury.

Prior to trial, the State presented two photographs of the victim's genitalia to use at

the trial in order to show the extent of her injuries. After viewing the photographs, the trial court determined that the pictures were "uncomfortable" but "not grotesque in that there's not cascades of blood or some of the things we see in some crime scene pictures." The trial court noted that the State had to prove both "forcible sexual penetration" and "bodily injury" and "if they have a photograph that depicts an item that is one of their elements of proof . . . [the trial court would] not limit them to using a sketch or something less than . . . an actual photograph. . . ."

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts). In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

Although the photographs in question are close-up photographs of the victim's vagina,

and certainly uncomfortable to view, we conclude that the trial court did not abuse its discretion in admitting the photographs. It was not overly prejudicial for the jury to see the extent of the victim's injuries and to hear an explanation of those injuries from the nurse practitioner who examined the victim. The photographs were also probative to the determination of whether forcible sexual penetration caused the injuries. The trial court noted the sensitive nature of the photographs and asked counsel to pass the photographs to the jury rather than projecting them on a screen on the wall. Moreover, the photographs were merely one piece in the overwhelming proof that Defendant committed the crime, therefore, we cannot conclude that the trial court abused its discretion by the admission of the photographs.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE